Good morning, Your Honors. May I please the Court? My name is Bruce Ortega from the California Attorney General's Office, and I represent the appellant and the cross-appellee in this case, the State of California. With the Court's permission, what I would like to do is open for ten minutes and reserve the remaining ten minutes both to make rebuttal on my appeal and to respond to any contentions that the petitioner may make on the cross-appeal. There are numerous issues in this case, numerous hurdles I frankly acknowledge that I have to overcome to prevail. I can't possibly address all of them, nor would I attempt to, so I thought what I would do is spend my time addressing the first issue, and that is the State Court of Appeals' conclusion that the introduction of the victim's diary in this case into evidence was not a confrontation clause violation, and the District Court's ruling that the State Court of Appeals' determination was an unreasonable application of Idaho v. Wright and Ohio v. Roberts, which mandate that hearsay satisfies the confrontation clause only when there is adequate reliability such that adversarial testing would be of minimal utility. This is a habeas case. The judge also found that, or at least held, that the California Court of Appeals' determination was contrary to established federal law. Unreasonable application. Unreasonable application. Correct. And as Your Honor pointed out in a recent decision in Clark v. Murphy, an unreasonable application is an objectively unreasonable one. And Your Honor wrote, while the objectively unreasonable standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than we have previously afforded them. Judge Alsop, because Clark v. Murphy was after Lockyer, which was after the decision in our case, applied the previous standard of deference on AEDPA habeas, that being the Van Tran standard, that objective unreasonableness is clear error. Well, the Van Tran standard is out now. Correct. Correct. So the question becomes now, under the even greater degree of deference due state court determinations, was the state court decision that this diary had adequate indicia of reliability objectively unreasonable in light of Ohio v. Roberts and Idaho v. Wright? And we would suggest that the three reasons that the court of appeal relied upon are not objectively unreasonable. The first being that there was no indication that Mary's diaries were made in contemplation of pending or anticipated litigation, such as divorce. Now, we acknowledge that in December of 1993, she was thinking of divorce. But there was no evidence that she was keeping these diaries in contemplation of any possible divorce litigation. As the state court of appeal concluded, it appears Mary's diaries were made as part of her regular process of recording the events in her life. And that was supported, that's supported in the record by the testimony of her son, who stated that she had been keeping diaries since about 1960. The second factor the court of appeal relied upon was that there was no indication that Mary had a motive for fabricating anything she wrote or biased. Now, we recognize that both the district court and the petitioner take great exception to that. It's their position that many of the diary entries themselves, the language and the tenor, show bias. For example, Mary writes, he's a beast. He's a person who is not going to do me right. He's aged me 20 years and five. He's cut me down to a toothpick. The petitioner in the district court stated that that's every indication that she was biased. And the cross-examination would have been of utility here. Our response is twofold. One, we have to recognize that the hearsay exception this came in under, California 1370, is an exception for statements that purport to narrate, describe, or explain the infliction of threat of physical injury upon the declarant. And given that, there's necessarily going to be language that shows anger because, generally speaking, domestic violence victims are angry at the perpetrator. We think the issue is whether or what is the extent of the bias and whether there's other indicia of trustworthiness here. And we think that that's shown by the fact that along with all of the damning assertions she makes about petitioner, she self-incriminates. She writes that she slashed him on the arm with a letter opener. He was bleeding like a stuck pig. I got pissed and I went after him. I hit and I hit and I slapped him once good across the face. Another time, she apologizes to the victim for lying to him. On two occasions, she states in the diary that she loves petitioner. It's our view that all those are factors that at least keep the state court of appeals decision from being objectively unreasoned. What I would then do is I'll sit down. Why don't you rest now and we'll hear from Mr. Kressler and then respond to that. Thank you, Ron. Mr. Kressler, good to see you again.  Yes, Your Honor. Good to be back. And good morning. Michael Kressler appearing for the Applee and Cross Appellant, Timothy Charles Parle in this matter. Your Honor, is it possible for me to reserve some of my time on the issue that we are the Cross Appellant on? If you wish. Yes, I would like to do that. Addressing the issue of the confrontation. We look, of course, we start with the presumption from Idaho v. Wright and the Roberts v. Ohio case that hearsay is presumed to be unreliable and that there must be circumstances indicating trustworthiness that are so strong that would indicate that cross-examination would be of marginal utility. Counsel, remember, we're here on federal habeas, which has a much higher threshold, as you know. Help us figure out why the California Court of Appeals determination was unreasonable under federal law. Certainly. I was just trying to identify the controlling United States Supreme Court federal precedent that this issue must be analyzed under recognizing clearly that as a state habeas petitioner under 28 U.S.C. 2254D, that yes, we have the burden of showing an unreasonable that the decision of the state court of appeal here was contrary to or an unreasonable application of this controlling precedent or involved an unreasonable determination of fact, which I think also comes into play in this case. The thing is that to me it is a contrary to the situation that we have here because if you look at the state court of appeals decision, it never really identifies the correct legal principle that the degree of trustworthiness that must be shown is such that would render cross-examination of marginal utility. And it takes this statute, this California Evidence Code statute, and it deals with the two factors that are enumerated there, which are not exclusive even under the terms of the statute, nor could they be exclusive under the controlling U.S. Supreme Court precedent. So we have this whole point, was it done in contemplation of litigation? Was there an indication of bias or motive? And then the state court also adds as its only positive seemingly finding as to trustworthiness that this was a regularly kept diary. Now, I'd like to go to that whole question of bias and motive because I think right here we have a finding of the state court that there was no evidence of bias here. And I think this is totally contrary to the record that was before the state court. We have a person here who within contemporaneous with these diary entries was committing acts such as criminally vandalizing Mr. Parle's automobile, going out slashing all four tires on his car, beating his car with a hammer. This is a person who, roughly contemporaneous with this, took an overdose of drugs and was involuntarily hospitalized as a danger to herself or others due to her mental state. These are indications of bias, motive, untrustworthiness that come out from this record. We have the evidence that was excluded, which I'll get to a little bit later, that she had told the nurse while she was involuntarily hospital about her feelings of anger and vindictiveness toward Mr. Parle. But doesn't this always, at the end of the day, doesn't this come down to an interpretation of Idaho v. Wright? The California court read it one way, Judge Alsop read it another. Help us sort that out. Well, Idaho v. Wright says you must have circumstances indicating trustworthiness that are so strong that it rebuts the presumption of unreliability and basically you have to show that cross-examination would be of marginal utility. Basically, the state court did much as Mr. Ortega does. They read it. They say, gee, it seems plausible to me. That's good enough. All right, but if you look at Idaho v. Wright, that's not the test. That's not the proper analysis. You must look at the circumstances of the making of the statement. And Idaho v. Wright cautioned about looking at the contents of the statement and then comparing it to other evidence in the trial for corroboration. They say that is improper. That's not correct analysis under this, under the confrontation clause. Whether there's a motive for fabricating. Yes. And certainly the diary doesn't seem to take as a motive for fabricating. In the writing of the diary, it seems to be a state of consciousness. It's a pro. It's a defendant. Sometimes it's a anti-defendant. Sometimes it's a citizen. It doesn't seem to me the kind of file that you look for in determining whether a written document should be fabricated. Your Honor, it seems to me that if this person is committing criminal acts of vandalism against the person, that you've got a pretty strong indication of bias. Well, we have these assertions here, for example, that she blames him for the fact that she's been in three auto accidents in the last year. Where is that coming from exactly? If she's blaming him, say that she was put in the loony bin on account of him when all the evidence indicates that her stay in the loony bin was prompted by her own overdose and the opinions of psychiatric people that she was mentally disordered to the point that she was a danger to herself or others. Looking at the diary, you can tell she's certainly not a thief. I don't think that's the thing that you have in motive. Well, I think, Your Honor, I would have to respectfully disagree with that. I think that this basically is the diary, as it appears, is her way of putting this all into her slant on the relationship, on what the causes of her problems are. It's no more trustworthy than if she had just sat and told her friend what her opinions were or some things that had happened. It's rank hearsay. And there's nothing about the circumstances of its preparation that indicate this degree of trustworthiness that the Idaho v. Wright decision demands. Where are the circumstances indicating trustworthiness so strongly that it matches up with a firmly rooted hearsay exception? They're not there. Counsel, you may want to go on to your cross-appeal. Yes. Let me discuss that as well. There's also a second issue kind of intervening here, which also is the fact that the writ was granted by Judge Alsop on two grounds. One, the confrontation, and then two, also the other grounds, the other evidence that was helpful to the defense and highly probative that was also excluded by the trial judge in this case. The State Court of Appeal held, yes, it was probative, no, it shouldn't have been excluded, but then declined to analyze this under federal constitutional principles, applied the more lenient state test of prejudice, and nonetheless affirmed the convictions. But these are very important portions. But wasn't there plenty of evidence of threats that came in anyway, not necessarily the specific hearsay objections which were upheld? Well, the threat evidence that was excluded in this kind of second issue, if you will, was the evidence of the vindictiveness that had been expressed to the nurse, number one, and then number two, you have the psychiatric testimony that was excluded that the defense put on and asked perfectly relevant questions that would have adduced probative evidence in favor of the appellant as to the potential effect of his manic disorder, which he had been diagnosed with, was under treatment for at the time of the homicide. And yet the trial judge would not let this evidence be introduced. And then the prosecutor, in closing argument, exploited this erroneous ruling that he had obtained from the trial judge. And when trial counsel tried to argue the impact of the manic disorder on defendant's state of mind at the time of the homicide, successfully objected, got all of it stricken, and basically informed the jury there was no evidence to support that. So we have yet these other important pieces of defense evidence that were wrongly excluded. Even the state court of appeals said they were wrongly excluded, they were probative to the defense. Well, they weren't hearsay, that was the real problem. It was hearsay. Well, I'm really focusing here, Your Honor, on the psychiatric testimony of Dr. Jackman that was going to be very helpful to the defense. That was wrongly excluded. It was probative, it was very helpful to the defense, and yet it was erroneously excluded. And this was a second ground that the district court relied upon in granting the writ. The cumulative impact of the first error, although Judge Alsop said the first error in and of itself, yes, the admission of the diary would justify the writ, but he also went on to address the fact that there was other errors of exclusion of defense evidence that also justified the issuance of the writ. Now, the cumulative impact issue per se was not the subject of COA. There was no COA on that issue, was there? Well, we won that issue, Your Honor. So the court, if you review Judge Alsop's decision, he grants the writ both on the confrontation issue solely and then in conjunction with the other errors of exclusion of highly probative defense evidence. So we won on those issues. Well, that's right. He held your way, but the question was, was he permitted to get into that issue given the fact there was no separate issue preserved under the COA? The COA had two issues, as you pointed out, the confrontation issue and the exclusion. Do you mean the original habeas petition? No, I'm talking about the COA, the certificate of appealability. Yes. From Judge Alsop. Right. We sought one on the single ground that we were denied on. We were granted on two grounds, denied on the third ground, and we sought a COA once the people appealed, then we sought a COA on the single issue that we lost upon. So you don't think there's a problem about looking at the cumulative error issue? For this court to look at it? Yeah. None whatsoever. I don't see any procedural barrier, or I don't understand my opponent to be raising any barrier to that. Let me finally get to the issue of the violation of Mr. Parle's right to testify on his own behalf. Here, when Mr. Parle took the stand to testify on his own defense, clearly one of the key points, we have this terribly tumultuous, mutually violent relationship that had gone on between this married couple for many years, and it certainly was, it involved violence on the part of both parties, threats on the part of both parties, and a crucial question that had to be addressed by the defense was, well, after all of this that had gone on before, why now did you honestly, if perhaps unreasonably, believe that your life was in danger from his wife? And the crucial point on this was the fact that she had escalated her threats, and a key portion of this was a phone call that she had made to Mr. Parle. It was Monday, I believe the homicide occurred on a Friday, and in this one she threatened to do a drive-by shooting on the home, and to kill Mr. Parle and their son. Now, this evidence was perfectly admissible under California law. Once again, the prosecutor persuaded the trial court to make yet another erroneous ruling in his favor, and got the trial court to repeatedly sustain totally erroneous hearsay objections during defendant's testimony. This was a crucial portion of his testimony. Something like nine times the prosecutor objected, and the court erroneously sustained these objections. This had, if you would invite the court to read this portion of the record during defendant's testimony, where there's a series of meritless objections that keep getting sustained, and the testimony keeps getting stricken. It had a very serious impact on Mr. Parle's testimony. He at one point says out loud, how can I answer the question without giving hearsay? He's visibly struggling to try to answer the question truthfully, and yet comply with the court's rulings. He invites, he asks to speak with the judge. He asks to speak with the jury. I mean, this is how great a distress that this series of erroneous rulings caused the defendant and the defense. It was a complete misapplication of the state hearsay rule, and it was, it amounted to an arbitrary infringement on his right to testify in violation of Rock v. Arkansas. Rock v. Arkansas said anytime that, you know, a defendant obviously has a very crucial constitutional right to take the stand in his own defense. If the state imposes arbitrary restrictions on this testimony, then there has been a federal constitutional violation. That's exactly what occurred in this case. And the attorney general, the state court of appeal, and yes, even the district court basically said, well, yes, but there was some other evidence of threats. And so keeping this out really didn't, wasn't of that great importance. And yet when you step back and you look at the entire defense, this was an extremely crucial point to show how the nature of the threats had escalated dramatically in the week prior to the homicide. Counsel, you may want to reserve if you wish. I would like to reserve my remaining time. Thank you. Thank you, Your Honors. Let me, this case is confusing procedurally, so let me see if I can clear up perhaps some of the court's thinking on the cumulative error. The district court granted the writ not only because it found the confrontation clause violation prejudicial, but then on a second ground, a cumulative error ground, it granted the writ. The district court found that the confrontation clause violation combined with two other errors mandated granting the writ. But in this case, the state court of appeal found five errors, four of which were of state law variety, one of which was of federal constitutional variety, not including the confrontation clause. It found no error. All right, but the question is, and maybe you agree with counsel, the question is was the cumulative error challenge preserved in the COA? Was there a COA on that issue? The government doesn't have to get a COA. I know. He granted the writ on that cumulative error ground. I'm challenging, I would be challenging the cumulative error ground. The judge did not grant the COA for the petitioner on the cumulative error ground because the judge ruled in their favor. Therefore, is there jurisdiction? That's my question. I believe you have jurisdiction. Except that my position is that if this court were to find that there was no confrontation clause violation, then what do we do with the cumulative error ruling by Judge Alsop? Because he included the confrontation clause error in it. Right. In other words, the question is do we simply reverse on your assumption, or do we reverse and then remand for further proceedings with respect to the cumulative error issue? That's what I suggested should happen because my reading of the law is a harmless error, a cumulative error analysis is a mixed question, and I felt like, well, Judge Alsop should have the first go at determining whether there's cumulative error here, taking out one of the prongs he found cumulative error on. In petitioner's briefing, they say, no, they don't want that. It's all ripe here. Your Honors can make a ruling on the cumulative error issue apart from the confrontation clause, and I suppose that's correct because the court of appeal in this case made a cumulative error determination, not including the confrontation clause violation. How does it affect the mix if we find that there was error in not allowing the defendant to respond to the questions? Okay. How does that affect that? Okay. Then if Your Honors find that, okay, then and Your Honors determine that, okay, there's no, there was no. Well, let me step back, okay? I suppose the first question for Your Honors is if we find there's error in the rejection, in the sustaining of the hearsay, was it prejudicial under BRAC? And what if we find that? Then I lose. Okay. But I don't think that that's the case because I think as Judge Alsop in the court of appeal noted, there was all sorts of other evidence that matched what petitioner wanted to say in the erroneous hearsay, including in the statements he made to the police, which were shown, and he was making the exact same statements, Mary was threatening me in a drive-by shooting. But, again, if Your Honors were to find error and not prejudicial under BRAC on its own, Your Honors have to decide whether that's another reason to send it back for a cumulative error analysis by Judge Alsop. Because the state court... But you also say even if we affirm on that issue, we still have to send it back. That's how I understood it. I just want to be sure I understand Your Honors. But we don't have to send it back if we agree that the cross-examination or that the defendant was improperly permitted to present his defense. You'd have to find that the state court of appeals determination was objectively unreasonable application of ROC and that it was prejudicial under BRAC. And that concludes the matter and he gets a new practice, right? That one issue would, irrespective of everything else. And I won't get into any more with respect to that other than to, again, note that it's not objectively unreasonable, as the court of appeal held here, or even Judge Alsop, when you factor in all the other evidence going to her threats and her actual violence. Now let me go back very quickly to the confrontation clause. And Mr. Kresser's position is, well, there was bias here, and he points to factors that happened after the making of the statement. Her behavior that had nothing to do with the making of the statement. When you look at the statement itself, is there evidence in there that would show reliability? Or, put another way, that would make it objectively reasonable for the state court to think so? And for all the reasons we articulated, we think so. We don't think you can look at evidence that Mary vandalized the car two months after she makes a diary entry to say the diary entry was unreliable. And not even Judge Alsop pointed to those factors. He looked only at the diary itself. Unless the court has any other questions, we'd submit it. Thank you, counsel. Mr. Kresser, comments limited to the cross-appeal only. Yes, Your Honor, thank you. Again, going to the point of the prejudicial impact under the substantial injurious effect of the restriction of the defendant's testimony in this case. We looked at the claims of Mr. Ortega that, oh, well, this is just cumulative to other evidence. Once again, I want to point out the crucial nature of this evidence in light of the case as a whole, where you've got this background of mutual violence of a nonlethal variety, prior threats. Why did it end up that week ending up the way it did? Why did he start fearing her in a way when, in the past, both the violence and the threats of violence were nonlethal? It's because they changed in character that week. That was extremely important. That came in in no other way whatsoever. There is no other evidence that substitutes for that which was wrongfully excluded by the state court. Therefore, it's not reasonable to say that it had no substantial and injurious effect. Once again, I ask the court to review that portion of the defendant's testimony. Even on a cold record, you see just how it absolutely stopped the defendant and the defense right in the water. The series of objections, the series of striking, it left the defendant and defense counsel in a very bad position. Did the jury have options for lesser includence? It did, Your Honor. What were the jury's choices? The jury's choices were either involuntary manslaughter, voluntary manslaughter, second-degree murder, or first-degree murder. Thank you, counsel. The case just argued will be submitted for decision. We will now hear argument in Davis v. Del Papa. Mr. Turner, good to see you again. We saw you earlier this week as well. Thank you, Your Honor. Pleasure to be back. I'm Paul Turner with the Federal Public Defender Office in the District of Nevada. I'm representing Mr. Davis this morning. I'd like to reserve two minutes for rebuttal, if I might. Do so. As I mentioned yesterday in the other case, I had sent in a 28J letter with respect to the Wiggins case, dealing with the general subject of duty of attorneys to properly investigate their cases. I would also like to bring one other case. I don't think the 28J made its way through the maze of the court yet, but if you're citing the Wiggins, we know all about Wiggins. I had one other case that I'd like to allude to a little bit later in my argument. I filled out these forms. Can I send them to the clerk? Yes, you may. Thank you. Alvarado v. Hickman, which is cited, it's a Ninth Circuit case, 316F3-841. It deals with the general subject of juveniles in the criminal justice system, and in particular, confessions. And I would like to address it a little bit later in the context of this case. It's not directly on point, but I believe it is an excellent background case for representing a juvenile defendant, as I'm doing this morning. The uniqueness of this case, however, the true uniqueness of this case, and I believe this case is an exceptional case, is that my client, Mr. Davis, pled guilty to a crime that he was never charged with. He pled guilty to felony murder. He was charged. It's not a bar. Excuse me, Your Honor. It's not a bar. A negotiated plea could be with respect to any crime. Yes, that's correct, Your Honor. The plea negotiation here was to first degree deliberate willful murder. That was the plea negotiation. That's in the record here. But it's not a theory of felony murder, is it not? Excuse me, Your Honor, but when the prosecutor informed the court of what was happening, he indicated that the defendant was pleading guilty to count one of the information. Count one of the information is deliberate, willful, intentional first degree murder. And my client, Mr. Davis, never admitted ever to anyone that he intentionally killed the victim. In fact, it's generally agreed by everyone in this case that it was an accident, that he did not intentionally kill anyone. Yeah, but here we're dealing with the appeal from a guilty plea premised on the admissions that were made with respect to the robbery. And in felony murder, intent is not required, is it? As long as the facts are made out with respect to the robbery, which are pretty clear, are they not? Certainly for purposes of this morning, I would agree with that, Your Honor. Then I don't see what's left other than knowing and willingly. And obviously there's not much to support the notion that the plea was made knowingly. He understood. He told the judge that he understood what the charges were and what he was doing. Did he not? No, he did not, Your Honor. All he admitted was the facts of a robbery, basically. He was never informed by the judge. The words felony murder do not appear in the record of the plea. But he said that he killed her in the process of trying to keep the gun, take the gun without paying for it. In essence, Your Honor, that's correct. His actual answers are like one word, yes. I had it right here when I walked in and then I closed the book. That's correct, Your Honor. Full dialogue, so I don't know where it is now. Only the facts. He is admitting the facts which constitute felony murder. But you have to understand the context here. He is not charged with felony murder, so he obviously couldn't get notice of felony murder from that document. There's nothing about felony murder in the information. The judge never mentions felony murder. There's nothing mentioned of felony murder. And his lawyers, who I think the facts of this case will quickly reveal to Your Honors, his lawyers never told him about felony murder. And, indeed, the COA issue is critical here, I believe. And if I might just read that to the Court, if you don't mind. The COA issue granted by the district judge, Judge Reed, reads as follows. Whether the district court erred in ruling with respect to ground one of the petition, that's the plea, that petitioner's plea of guilty to first-degree felony murder was knowing and voluntary and not in violation of petitioner's right to due process of law under the Fifth and Fourteenth Amendments, here are the critical words. Absent a formal charge of felony murder, Judge Reed has found there was no formal charge of felony murder, and absent explanation of the elements of felony murder, Therefore, Judge Reed, for purposes of the COA, has agreed to the fact that this was absent any explanation of the elements of felony murder, where practitioner admitted the facts constituting felony murder. So this is the most pristine case I think you could see. You have an admission of facts and nothing else. Zero. And our position... The admission of the facts constitute felony murder. Your argument is noticed, I say. My argument is noticed, Your Honor. And if I might just very briefly go through the cases that support this argument. But here are those in your brief. Yes, they are in the brief. And of course, just very quickly, I don't want to take up the Court's time. It all starts with Boykin v. Alabama, although it may go back earlier, but it certainly starts with Boykin v. Alabama, where the Supreme Court indicated that because a guilty plea is admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law, the law in relation to the facts. It's an equation with two parts, law, facts. The defendant has to understand both. Following up that is Henderson v. Morgan, which is an important case here. Judge Reed looked at that very closely. Henderson reaffirms that principle, that without adequate notice of the charge against him or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense. And that Court cites to Smith v. O'Grady, an earlier Supreme Court case. So the principle of Boykin is followed up in Henderson. It goes on to Marshall v. Lonnberger. And this is a very important case because in Marshall, the Court says that it granted cert in Marshall to review the relationship or interrelationship of Boykin and Henderson. And this is what the Court said in Lonnberger. It said that unless the accused has received real notice, real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process, unless he's got that, and the preamble to that was it is well established that a plea of guilty cannot be voluntary in the sense that it constitutes an intelligent admission that the accused committed the offense unless the accused has received real notice of the true nature of the charge. It also goes on to say that under Henderson, you're presumed to have been informed, either by your lawyer or at one of the pre-sentencing proceedings, of the charges on which you were indicted. Well, the charges on which Mr. Davis was indicted is intentional first-degree murder, not felony murder. I would submit to the Court that a long series of Supreme Court cases, including the ones I've mentioned, documents that if you don't have notice of the charges, you can't plead guilty under the United States Constitution. And the fact that you admit facts is not enough. Think about it just for a moment what this would mean. It would almost be like a kangaroo court situation where you could get a defendant to stand up, and the Court would say, Mr. Defendant or Miss Defendant, would you please start talking about what happened the day in question? When you get to a point that you've admitted a crime, we'll call that a plea, and that'll be the end of the day. That can't be right. The defendant has to know what he's pleading to, and that is the key factor that's missing from this case in ground one, which is the first point of the COA. Counsel, what about the ineffective assistance claims that you're making? You do have a threshold question, do you not, as to whether there's a procedural bar? Yeah. Your Honor, on the second one, which would be COA 2 on ground three, I would like to just submit that, unless the Court would like to ask. Which is ground three? Which is the ineffective assistance appellate counsel. I'd be more than pleased to respond to questions, but otherwise I'd just like to submit on that. I would like to go to the other two, if the Court would permit me. I have a question that's maybe tangential, because I know it's during the pre-colloquy, just before I came in here, but I don't have that much background in Nevada law. When a person commits a felony murder, what's the sentencing range? I mean, is life without parole typical? It's possible. Certainly possible? Yeah. I didn't practice in state court in Nevada. I've been only a federal public defender, but it's certainly possible. My experience in my previous cases would be that it happens quite often, actually. It could be life with, it could be death. This case was, this case, my client was told by his lawyers that he's going to die. That's what this case was. So the consideration for his plea was the fact that he didn't have to worry about the death penalty. Right, because his attorneys, within a period of one month, convinced him that let's do a lay down on this case and take a plea and not be lawyers. That's basically what happened here. Within one month and two hours of talking with this defendant, this defendant is convinced that he's going to die. He's a 16-year-old black male. He's killed a 29-year-old white woman, and they're telling him that you will not get a fair trial in Las Vegas, Nevada. You take a plea. He's 16 years old, he's got a ninth grade education, he takes the plea. This is a pathetic example of lawyering that shouldn't be tolerated by any court. And if I could get a little more specific. Before I get into the specific issue, what about the failure to move to suppress? Yes, Your Honor. I think, and that's why I cited the Alvarado case to the court dealing with juveniles, because I think that's a very important factor here that he's a juvenile. He should have been, they should have investigated the circumstances here. They did have information that it was an accident and that everybody thought it was an accident. A lawyer doesn't quit at that. You interview the witnesses. What could he have found that he didn't already know? There was plenty of testimony about it being an accident. No, that's true, Your Honor, but if you read, I'm sure you have read, the reports of the two witnesses, Arthur Cullens and Mr. Harvey, they're not consistent. They may be positive toward an accident, which is excellent, but there's more to these witnesses than just that. You have to look at their statements, and you will see that the second gentleman, Mr. Harvey, indicates that he and Mr. Cullens were looking out the window when the gun went off and that he never saw the gun pointed at anybody. Mr. Cullens, of course, says that Mr. Davis was pointing it at somebody, and, of course, that's critical to the robbery theory here. Mr. Davis gave a statement, and if you read, as you've read Mr. Davis' statement, I'm sure you're struck by the fact that it's a series of leading questions. The only word Mr. Davis gives is yes. All of the information comes from the police department as it's clicked off. His uncle was with him, and that's certainly a factor, but I would say that a lawyer meeting the Strickland standard, as enunciated under Wiggins recently, is going to have to investigate to see if the correct decision is, one, don't file the motion to suppress because it will be a failure, and, two, take a plea. It all kind of intertwines. If you don't do any investigation, I think the real message of Wiggins, and this court's Douglas V. Woodford, is that, sure, the final result may make sense, but that's not the answer to the constitutional issue. Did the lawyer investigate? There's no reasonable decision if it's just a guess. You have to investigate your case. Sure, but you also have to establish that the result of the investigation would have made a difference. Correct, and I think that if I... The only issue is accident. There was plenty of evidence about accident. You got that in. But one issue, Your Honor, would be whether or not he actually did point the gun and really whether it happened the way his statement said it did. And you have one witness saying that he doesn't know. The other guy said he did know, but they were together looking out a window. There's something wrong with this picture. It needs to be checked out. Is your inference that there's another witness out there that could have been found or would have said something different? No, but I think, Your Honor, there were only four people in the room, and one died, obviously, and there were three left. One of whom is your client. One of whom is my client. Are the two witnesses you've heard? Are not consistent in what they said, if you read closely those reports. They're not consistent. They're consistent on accident, maybe, which is fine, but there are other things you have to look at to see if this is a case you need to file motions in. I don't think you can just quit on the case because you see something positive. A lawyer's duty is to investigate the case. Technically, it's not the question of identifying other witnesses. The question is that he should have done more to ask more questions of these witnesses. Well, that would be a first step, and that could lead to something else. I think you have to do the job to see what it leads to. It may lead to nothing. That's why a lot of a lawyer's work, as we all know, is, you could say, in hindsight, is wasted. But it's wasted. It's the duty you have as a lawyer. You have to do this. All right. Now, on the motion to suppress the statements of the police, what is the showing you can make that somehow or other that would have been sustained under Nevada law? Isn't a 16-year-old treated as an adult under Nevada law in this case? In this case. But I think, again, you have to know the circumstances and you have to investigate them from a constitutional perspective. And that's what Alvarado reaffirms, and it's an excellent case for juvenile law because it goes into a lot of the history that the Court's probably familiar with, including it references Enright Gault. It goes back to Gault and quotes it, as this Court has emphasized, Supreme Court, that admissions and confessions of juveniles require special caution. This is an area of special caution for a lawyer. He's representing a unique client, and you have to do the right thing. You have to investigate your case. Why don't we hear from the State for a moment? We can hear back from you. Good morning, Your Honors. My name is Robert Wheelan. I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada. I have the privilege of representing respondents. A couple of points I would like to discuss just generally. Counsel said that the Federal District Court Judge Reed found as a fact certain things and that those certain things are represented in the Certificate of Appealability. I submit to the Court, first of all, that that has not been found as a fact. There have been a variety of representations of fact made by counsel that have not been found to exist by the courts of Nevada nor, in fact, any other court, and they are improperly offered as facts. Not least of the one is what I represented or what he represented as a fact in the Certificate of Appealability. I bring that to the Court's attention because, for this reason, if an application for a Certificate of Appealability is granted by a court and, for whatever reason, that somehow becomes a basis for fact, when no facts, such facts, are set either in the court's order, which is reflected in Court Record 84 in this particular case, then respondents have to know that that, in fact, can be the case. I'm not aware of any procedure or law in this court or any other court, for that matter, that would allow for an application of a Certificate of Appealability to all of a sudden become, these are the facts. Counsel has made a variety of representations, basically, that counsel rolled over. They didn't do anything. Those are not factual findings that have been made by any court whatsoever. They are not binding on... ...the case that the public defender knew that the petitioner was only 16. The record indicates, at the beginning of the transcript of the guilty plea, that when Mr. Henry is talking to the court, he said that they inadvertently told him previously that the petitioner was 18. That's how the robbery charge got there. So, inadvertently, obviously, they knew prior to then that, in fact, he was 16. The defense counsel did. But what... I've got to say, I'm troubled by the fact that it's a 16-year-old entering a guilty plea to life without parole. That's amazing. The public defender would come to the immediate conclusion that a 16-year-old is facing a death penalty. Well, we don't know. You're making a variety of assumptions, Your Honors, that are not necessarily... Well, help us. What would possibly justify a recommendation by counsel to the 16-year-old that it's a good deal to plead to life without parole? First of all... What's the risk you're averting by doing that? First of all, he avoids the death penalty. Well, is that going to... Does it establish the death penalty applies to a 16-year-old? In 1988, it was an option. But has Nevada put any 16-year-old to death? Beg your pardon, Your Honor? Nevada put any 16-year-old to death? No. But that's an irrelevant consideration. I don't think that's irrelevant at all. Well, may I respond to Judge O'Scallion's remark? The other part of it is that you seem to suggest that the negotiation is illusory. Well, it simply is not. Because the fact of the matter is, not only is he not eligible for the death penalty anymore, the state dropped the use of the deadly weapon enhancement. Now, that's important. But how can you get a sentence more enhanced than life without parole? That's what I'm going to explain to you. The importance and the significance of that particular circumstance is that although it's life without the possibility of parole, he has thereafter, under Nevada laws that existed in 1988, the ability to approach the pardons board after 20 years. Okay? If he'd had the deadly weapon enhancement, he would have not been able to approach the pardons board for 40 years. That is important to a 16-year-old, to be able to have some opportunity to approach the pardons board, not parole, but the pardons board, at the age of 36, as opposed to the age of 56. All right. He's 31 now. In five years, he can... I believe he has a chance in five years at making an application for a pardon. I'm not sure I heard you correctly. At the end of 20 years, what procedural options does he have? He would have the ability at that time to make an application for a pardon. A pardon. Now, that's a tall order. By the pardons board. Whereas in the other circumstance, he'd have to wait 40 years. That circumstance was acknowledged in the petitioner's traverse to respondant's answer. I note, however, that the petitioner's traverse, I noted this last night, is not part of the excerpts of the record in this court. The other part of... I guess that if he had a sentence that was paroled. If I may, Your Honor, this court has addressed the question with respect to that aspect. I would direct the court's attention, this court's attention, to Harris v. Wright, 931. No, it is not, Your Honor. I'm responding to the judge's question. Be sure and give these citations to opposing counsel. I will. I have three copies to the court. I will do that. Harris v. Wright, appearing at 93 F. 3rd, 581. At 584 through 85, 9th Circuit, 1996. Rodriguez, R-O-D-R-I-G-U-E-S v. Peter, 63 F. 3rd, 546. 556 through 68, 7th Circuit, 1995. And Rice v. Cooper, 148 F. 3rd, 747, 752, 7th Circuit, basically holding that a life sentence without the possibility of parole for a 16-year-old is not violative of the Eighth Amendment. Okay, we don't have an Eighth Amendment challenge in this case. I understand that, Your Honor, but in response to the question, it seemed to encompass the propriety of... A 16-year-old with no prior adult record? Well, the facts in this particular case, Your Honor... The theft and the drug addict? Well... No, there are a lot of facts here that... The theft from a drug addict? Your Honor, that's with all due respect... She's not a very sympathetic white female? Well, Your Honor, with all due respect, whether she's a drug addict, what race, color she is, she is, in fact, a human being deserving of the protection. The point is that the counsel told him, look, you're going to get the death penalty. You shot this white woman. We don't know that. We don't know that at all. That is not established as a fact by any hearing whatsoever, Your Honor. The other part of this is that, since you're asking for the explanation, if you look at the pre-sentence report on this individual that is, in fact, in the excerpts of the record, you will see the report of the pre-sentence officer shows that this was a pitiless, remorseless individual. And it could well be that this individual may have gotten the death penalty, albeit he's 16. That's really the only mitigating factor in this whole thing, because what he did, regardless of who his victim was, is in the course and conduct of the perpetration of a robbery, the individual, he got the gun, he took it from that person. And notwithstanding what counsel said, it's generally agreed that this was an accident. I don't agree with that. I don't concede that. I don't think the state has ever conceded, necessarily, that this was an accident. And, in fact, this individual said, during the course of the guilty plea, she didn't lower the price to 75. And as I put the gun down, as I closed the trigger, the gun shot. Now, this is after this individual had picked up the gun, which was laid in front of him. It was empty. He got the bullets for the gun. It was a revolver. So he opened it up, put the bullets in there, pointed the gun at this individual, and said, lower the price. And the individual said, retained, said, I'm not going to do it. And he fired the gun. Now, counsel is talking. Pardon me? He said, at the guilty plea, as I closed the trigger, the gun shot. That appears to excerpt the record 735. Probably meant close the hammer, right? He said, I closed the trigger. I know how you close a trigger. I know how you close a hammer. It's like pulling a door closed. How do you pull a trigger? Yeah, pulling a door closed, pulling a trigger, same thing. When you aim a loaded gun at somebody, somebody's going to likely die. Now, of course, the issue we have here that's been preserved is ineffective assistance. And it seems relevant to me, and I need to sort this out, but what you're telling us is that it was not a bad recommendation to take life without parole because it preserved the option for a pardon in 20 years, and it dodged the death penalty. Now, that's the assumption that the death penalty was a viable punishment for first-degree murder in 1988. Is that established in the record someplace as a way we could? Yes. As a matter of fact, it is. If you look at District Judge Bonzi Avani's order denying one of the petitions, he does, in fact, make reference to the fact that this, had the full force of the law been brought to bear on this individual, he could have faced the death penalty. All right. A second, and then that remains the pardon issue. What does one need to show to be eligible for a pardon in 20 years? I honestly can't answer that, Your Honor. Pardon as in all those sorts of things is discretionary. Is this tantamount to parole hearing with another name, or is it what typically involves in a pardon either a pretty good showing of actual innocence or something of that nature? Well, what I believe it would entail in this case could be a commutation down to life with the possibility of parole. And, again, what kind of a showing does one need for that? I honestly would imagine some sort of rehabilitation, good conduct. I've never participated in such a hearing, Your Honor. Is it in the statute someplace, or? Yes, it is, Your Honor. So we might. The other point that I would like to make is that counsel, this has to do with a guilty plea. It is not a notice issue. It is not an issue, was the information sufficient? Was I not informed of what the nature of the charge was? That's a separate issue from what the certificate of appealability is and what is, in fact, before this court. This is not something where I wasn't able to present a defense because the information was so poorly crafted that I didn't know whether I was being charged with a robbery or, you know, some fraud or theft. The information says very clearly who got murdered. Now counsel has said and made representations that this individual was not informed of the nature of the charge to which he pled. Well, that's not been established as a fact. And if we look at the case law on this, the guilty plea is knowing intelligently and voluntarily entered. As you pointed out, Your Honor, you notice that the whole issue here and the whole complaint is, well, what was the intent that was expressed? Well, there's no question that this individual was committing a robbery, that he intended to commit a robbery. I think Mr. Turner's argument is that there was no specific reference to felony murder. None is required, Your Honor. And in order for them to take a guilty plea, all he has to do is acknowledge the elements of the offense, which is what he did in the court. The elements of which offense? Felony murder. And I would submit, Your Honor. Even without being told felony murder? That seems to be, I think, where the confusion in this case is because it's very clearly, number one, the nature of the charge is murder. Now maybe the specific theory of murder, as in felony murder, is not specifically mentioned in the information. He didn't plead guilty to first-degree murder. He did plead guilty to first-degree murder. And I would submit to the court three things in that regard. First of all, the canvas shows, contrary to what petitioner speculates, that he did, in fact, do this with malice aforethought, premeditation and deliberation. We are not conceding that this is an accident. Even if you were to accept that theory, though, however, Your Honor, it, the canvas shows that he established, admitted the elements of felony murder. And so the issue, I beg your pardon, Your Honor. Is there an overlap in terms of the showing between felony murder and first-degree murder? In this particular case, I think one satisfies the other. Felony murder under Nevada law, NRS 200.0103B, felony murder is also defined as first-degree murder. All right. Okay? Let me take care of that point. Okay. You know, I noticed in the Nevada Supreme Court address what you have to do to change a plea hearing. And I think you've gone over it. Defendant Norley waves his privilege. The first one is the defendant understood the consequences of his plea and the range of punishments. And I didn't see when I looked at any discussion of the range of punishments. I don't know if that's a factor or if it's even properly enforced. But he was told, basically, you enter the plea and you get life without parole. That's what he understood based on the record. Yes, Your Honor. Whether or not his counsel advised him that, you know, he was going to get death, you know, he was certainly death eligible based on the facts and circumstances of this case. But if they did tell him that, then he's certainly aware that the range of punishments is up to death. What's the low range, though? It would be life with the possibility of parole. That's the lowest you can get for someone to murder his life? I beg your pardon, Your Honor. I apologize. I cannot remember exactly what it was in 1988. Okay, thank you. But if that's the case, he certainly knows, if that representation is correct, he certainly knows he's eligible for death. And this is a stipulated sentence which is permissible under Nevada law. So that, okay, I know, you know, there's this possibility. Here's what I'm agreeing to as part of the negotiations. I'm just saying, again, an effective attorney would say, listen, here's the deal. If you go to trial, you could, I mean, if the worst is, you could be killed in this situation. However, you know, given your age, you may only get 20 years too under Nevada law because here's the range. The range is 20 years to death. I don't know if he had that discussion. That's not in the record. And I don't know if that's required. There's some indication that the Nevada Supreme Court has talked about the defendant has to be aware of the range of punishments. That's all I'm addressing. Well, that's kind of how we get into these presumptions, and that's how I think the federal district court got into Henderson, you know, the presumption of what was told. Now, that's the other thing about this case. It's strongly presumed, strongly presumed that counsel performed his duties, strongly presumed. And that's part of where Henderson is. It's strongly presumed that he informed him of the elements of the offense, including intent. It's strongly presumed that defense counsel did all of these things. And that's why you have the Henderson case, which says that, you know, if you can't find it in the record somewhere, what would be otherwise necessary for a Boykin canvas, you presume that counsel satisfied that aspect of it. That being the case, and no evidence having been presented to the contrary, the Nevada Supreme Court's decision is not contrary to or an unreasonable application of clearly established federal law. With respect to... I take it, since this is a plea, there was no appeal through the Nevada courts. There was a... Since it was a plea, it would not have been appropriate for a direct appeal. Right. It would have been on a post-conviction action. And the issues, there were a variety of issues subsequently attempted to be raised there. With respect to ground two that the court found procedurally barred, I'd like to direct the court's attention to this, to the recently decided Ninth Circuit case of Vang versus Nevada, which upheld the precise procedural bar as an independent and adequate state procedural bar. With that, I will close. If you have any further questions, I'd be happy to answer them. Thank you very much for your time. No questions. Thank you, counsel. Just maybe going in reverse order, Your Honor. The Henderson presumption doesn't really apply here at all because the presumption is based on a presumption a lawyer advises their client about the offense that's been charged against them. And as I mentioned, in this case, obviously, it was first-degree intentional murder, not felony murder. They are two totally different crimes in Nevada. They're different subsections of the murder statute, which is 200.030. A is the intentional murder, the willful murder, and B is the felony murder. And they are not lesser-included. They are alternative crimes completely. It's not like first-degree versus second-degree murder. These are alternative crimes under Nevada law. They could both be charged, but they weren't both charged. And is the sentence the same for both? I believe it is, Your Honor. I have the statute.  And this is the 1988 version? Yes. Yes, I have this right in my hand, and although it has some markings on it, I'd be happy to give it to the court right now if that will help you. But we have access to it. But Pardons Board, notwithstanding the respect I have for the Nevada Supreme Court, Pardons Board is made up of the Supreme Court justices and the governor, I believe. I've never appeared before Pardons Board, but this is what I understand. I have some clients applying now. It's closely akin, well, it's way beyond a parole opportunity. It's the only thing left when you have no rights in the legal system. You've exhausted everything you've got. It's your last prayer. And basically you have to fall before the court, in essence, and try to convince the judges and the governor that somehow or other you deserve to be released from prison. It has minimal... He talks about a commutation of the parole or the non-parole feature. Is that within their scope? Yes, I think now I don't believe they could do what Mr. Whelan was referring to. I believe back then they could commute it to life with, I think would be what they could do. But, of course, there's absolutely no belief that that's going to happen unless you have a... What does that mean? Yes, that's just like shooting in the dark. It's like having lightning strike you. I mean, a good thing can happen to you, but... What is it, though? Life without parole is literally what it means. Life with parole. Oh, life with parole, I'm sorry. I believe life with parole in this case would have been an opportunity for parole at 10 years at that time. I don't know, maybe 20 today. But I believe for the basic murder conviction it would have been eligible to go to a parole board after 10 years. Life without parole is no hope. That's really what life without parole is. You have no hope in your life. And you're 16 years old and you have no hope. It's not a good thing. Mr. Whelan said my client was remorseless, and I have to respond to that kind of a comment. I think that if you look at the police reports and the statements made by witnesses, you'll know that... This was in the PSR. If there's something in the PSR that says he's remorseless, I just don't have that... PSR and the record. I believe it is, Your Honor. It may not be. I don't have the full record with me today. But my client made a... The witnesses say he said, I'm sorry, that he looked like he was shocked. That's what the witnesses said to this event. Some say he didn't. Some say he didn't. I don't think it's fair to say my client is remorseless. That's just... But the record is what it is. Is it in the PSR or it's not? We'll find out. That's right. Can I click off just a few basic points to close for you? Certainly. One thing, on the COA, to me, and the argument just before this, I think, Judge O'Scannon, I think you emphasized how important the COA is. The COA shapes the whole issue before the court. And it's Judge Reed's COA. It's not my COA or anyone else's. It's what Judge Reed, in this case, decided was the issue before the court. And I stand on my statements about that. Just a few things to click off very quickly. Sixteen years old. Ninth grade education. No prior adult criminal history. One month from arraignment to plea. Turned himself in, interestingly. Self-surrendered the day after this happened. No written plea agreement. Extremely important fact here, unlike many, many cases. No written plea agreement. They didn't know he was 16, their own client. They spent about two hours with him. I'll submit the record will establish that. It's noted in our brief on opening brief page 23. Counsel advised him about death and basically told him what I told you, and that's on opening brief 24. We have that. Suppose we are persuaded that there was a dereliction of the Strickland standard and there was an effective assistance of counsel. What happens next? We grant the writ, it goes back to the state, then what? I think they'd have an option to retry Mr. Davis if they elected to do so. Obviously, I hope they would not, but he's been in prison, as you noted. He's been in prison basically in custody for about 15 years, and I would hope that they would not retry him, but that certainly I think would be an option they might have, and hopefully Mr. Davis would have a good lawyer, and I think he would. Thank you. Anything in summary? Your time is expired. This is an egregious case, and I appreciate the court's time. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: Hall, O'scannlain, Beistline